# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>KENNETH LAMONT SANDERS,<br><br>Defendant. | No. 18-CR-1025-LRR<br><br>**REPORT AND RECOMMENDATION** |

_____

This matter is before the Court on Kenneth Lamont Sanders' ("defendant") Motion to Suppress Evidence. (Doc. 7). The Government timely filed its resistance (Doc. 9), and I held an evidentiary hearing on the motion on August 1, 2018. For the following reasons, I recommend the Court **deny** defendant's motion.

## I. FACTUAL BACKGROUND

On February 16, 2018, just prior to 10:00 A.M., the Dubuque Police Department received a call from N.R.'s grandmother. N.R. is the daughter of Karina LaFrancois, who was defendant's girlfriend on the date in question. N.R., who was eleven years old at the time, called her grandmother on the phone[1] and explained that Ms. LaFrancois and defendant were fighting in their residence. N.R.'s grandmother told the 911 operator that her granddaughter told her that Ms. LaFrancois and defendant were "fighting really

---

[1] Defendant's brief states that N.R. sent her grandmother a message via Kindle and makes no mention of a telephone call. (Doc. 7-1, at 1). The other evidence of record and counsels' arguments during the hearing, however, indicate that N.R. called her grandmother on the phone. The parties do not contend that the method of communication is material to the current issues. I will therefore assume, without finding, that N.R. communicated with her grandmother via telephone.

bad," but the grandmother did not know why Ms. LaFrancois and defendant were fighting, or whether the "fight" was verbal as opposed to physical. N.R.'s grandmother also did not know whether any weapons were involved. The grandmother informed the 911 operator that three minor children were present in the residence: N.R. and two other children, ages seven and one. The grandmother also informed the 911 operator that she had difficulty understanding N.R.

Dubuque Police Officers were dispatched to the residence. The dispatcher did not share the complete details of the 911 call with the officers who were dispatched. Rather, the dispatcher told Officer Joel Cross only that there was a domestic disturbance, but made no mention of a fight, injury, or firearm. Officer Cross was the first to arrive at the residence, and Officer Tom Pregler arrived shortly thereafter. Several other officers subsequently arrived at the residence as well. When Officer Cross arrived at the residence, he observed N.R. through an upstairs window "acting excited," and gesturing at Officer Cross. It is unclear what N.R. intended to communicate with her gestures.

Officers Cross and Pregler knocked on the front door, and Ms. LaFrancois came outside to talk to the officers. Officer Pregler described Ms. LaFrancois as "very emotional" and "unstable." Officer Pregler testified that Ms. LaFrancois had visible injuries in the form of red marks on her face and neck. (Exhibits 6-8). Ms. LaFrancois, however, told the officers that everything was okay.

The officers informed Ms. LaFrancois that they also needed to talk to defendant. Ms. LaFrancois explicitly stated that she did not want the officers to enter the residence and offered to have defendant speak with the officers outside. The officers initially assented to speaking with defendant outside. When Ms. LaFrancois opened the door to go inside to ask defendant to speak with the officers outside, crying could be heard coming from inside the residence, though it was unclear, specifically, who was crying or where the crying was coming from. Upon hearing the crying, the officers who were

positioned outside the residence had a brief discussion as to whether they should enter the house to check on the crying person, and the officers ultimately decided to enter the residence.

Once the officers were inside the residence, defendant was very noncompliant, uncooperative, and argumentative. At some point, Ms. LaFrancois reentered the residence. Both defendant and Ms. LaFrancois adamantly insisted, repeatedly, that they did not want the officers inside the house and that defendant would go outside to speak with them. Defendant repeatedly referred to the house as Ms. LaFrancois' house, and when later asked if defendant and Ms. LaFrancois lived together, defendant replied "I don't live here." (Exhibit 2). Officers separated defendant and Ms. LaFrancois, with Ms. LaFrancois stepping outside. While outside, Ms. LaFrancois stated that defendant was living in the residence. Officers also learned that defendant and Ms. LaFrancois had a child together. Neither defendant nor Ms. LaFrancois ever gave the officers permission to be in the house or to search the house, and the officers did not have a search warrant.

When Officer Cross started to go upstairs to speak with N.R., defendant attempted to physically block Officer Cross from communicating with either N.R. or N.R.'s brother, who was also upstairs. Officer Cross eventually made it past defendant and was able to converse with N.R., at which time N.R. told Officer Cross that although she never saw defendant in possession of a firearm during the argument, N.R. could hear her mother yelling "Put the gun down! Put the gun down!" (Exhibit 1). N.R. further stated to Officer Cross that it sounded like Ms. LaFrancois was being choked during the argument.

N.R. told Officer Cross that the gun could be in a drawer in the downstairs living room. Officer Cross immediately went back downstairs and searched the drawer; however, he did not locate the firearm there. Officer Cross then spoke with Ms. LaFrancois, who initially denied there was a gun present. She eventually admitted that

she believed defendant had a gun while the couple was arguing, based on defendant holding his arm behind his body as though he was reaching for a gun that was tucked into his waistband. Officer Cross asked Ms. LaFrancois where the gun was and after initially denying any knowledge of the gun's location, Ms. LaFrancois stated that it could be in the couch. Officer Cross looked in the couch and located the gun. After Officer Cross found the gun, the officers further questioned defendant and Ms. LaFrancois concerning the gun and the circumstances surrounding the fight that ultimately led to the officers being dispatched to the residence.

## II. APPLICABLE LAW

### A. *Warrantless Search Standards*

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Evidence obtained in violation of the Fourth Amendment may be excludable. *United States v. Peltier*, 422 U.S. 531, 535-39 (1975). "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984) (citations and internal quotations marks omitted).

When officers conduct a search pursuant to their community caretaker functions or to exigent circumstances, however, no Fourth Amendment violation has occurred. *See United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006). Similarly, officers are not required to obtain a warrant to search when exigent circumstances are present. *United States v. Ramirez*, 676 F.3d 755, 759 (8th Cir. 2012). The Eighth Circuit Court of Appeals has explained the differences between when an officer conducts a warrantless search pursuant to his community caretaker functions and when he conducts a warrantless search due to exigent circumstances:

4

> Police officers, unlike other public employees, tend to be "jacks of all trades," who often act in ways totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of criminal law. *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). These activities, which are undertaken to help those in danger and to protect property, are part of the officer's "community caretaking functions." *Id*. They are unrelated to the officer's duty to investigate and uncover criminal activity. A police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention. *Mincey v. Arizona*, 437 U.S. 385, 392-93 (1978); *United States v. Nord*, 586 F.2d 1288, 1291 n.5 (8th Cir. 1978).
>
> When acting to investigate and uncover crime, on the other hand, a police officer acts at the core of his or her duties; it is to these types of actions that the [W]arrant [C]lause of the [F]ourth [A]mendment is directed. *See Johnson v. United States*, 333 U.S. 10, 14 (1948). A warrantless entry in such circumstances must be justified by probable cause to believe that a crime has been or is being committed and the existence of what are called exigent circumstances. Examples of such circumstances are when an officer is in hot pursuit of a fleeing felon, and when an officer reasonably fears the imminent destruction of evidence or reasonably perceives a risk of danger to the police or others. *Minnesota v. Olson*, 495 U.S. 91, 100 (1990).

*Quezada*, 448 F.3d at 1007.

In determining whether facts exist to authorize an officer to conduct a warrantless search under the community caretaker role or pursuant to exigent circumstances, a court is to consider not just the knowledge possessed by that particular officer, but the collective knowledge of all officers with knowledge of the circumstances. The collective knowledge doctrine provides that "[t]he collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who [conducted the search or seizure] when there is some communication between the officers." *United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008) (citation omitted).

5

Further, the reasonable belief standard used to assess whether an officer could conduct a warrantless search in furtherance of his community caretaker functions is a lower standard than the probable cause standard used to assess the constitutionality of a warrantless search conducted on the basis of exigent circumstances. *Quezada*, 448 F.3d at 1007. *See also Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984) ("[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests."). Finally, "[a] search or seizure under the community caretaking function is reasonable if the governmental interest in law enforcement's exercise of that function, based on specific and articulable facts, outweighs the individual's interest in freedom from government intrusion." *United States v. Smith*, 820 F.3d 356, 360 (8th Cir. 2016).

### B.    *Standing*

To claim the protections of the Fourth Amendment, a defendant "must demonstrate that he possessed a legitimate expectation of privacy in the location[ ] searched." *United States v. Camberos-Villapuda*, 832 F.3d 948, 951 (8th Cir. 2016). An overnight guest in a home "typically would have a legitimate expectation of privacy" in the home. *Id.* "When a person voluntarily abandons his interest in property, however, he relinquishes any expectation of privacy and may not challenge a search of that property based on the Fourth Amendment." *Id.* at 951-52. Whether a defendant has voluntarily abandoned a property interest is based on the totality of the circumstances considering, in particular, whether the defendant "denied ownership of the property and whether he physically relinquished the property." *Id.* at 952. "Abandonment is determined based on the objective facts available to the investigating officers at the time they conducted the challenged search. It does not depend on the defendant's knowledge or intent." *Id.* (internal citation omitted). When a defendant "unequivocally disavow[s]" any relationship with a home, the defendant has abandoned any property interest that he may

6

have had in the home. *Id.* A defendant need not flee the scene of a home to abandon it. *Id.* Rather, "a defendant's verbal repudiation of an interest in property can be sufficient to establish a defendant's abandonment of that interest." *Id.*

### III. DISCUSSION

Defendant argues that the warrantless search was unlawful, as no exception to the warrant requirement applied in the instant case, and that all evidence obtained during the search must be suppressed. (Doc. 7-1, at 7). Defendant further argues that all statements made subsequent to the discovery of the gun must be suppressed as fruit of the poisonous tree. (*Id.*). The government asserts that the entry into the home and subsequent search were justified based on the officers' community caretaking function and based on the existence of exigent circumstances. (Doc. 9-1, at 4-9). The government also argues that even if the search was unconstitutional, defendant lost his standing to challenge the search by repeatedly asserting that he did not live in the house. (*Id.*, at 9-10).

I find that defendant did have a reasonable expectation of privacy in the residence and therefore has standing to challenge the search, notwithstanding his disavowal of the residence. Nevertheless, I find that the officers' entry into the residence and subsequent search of the home were lawful. I therefore recommend that the Court decline to exclude evidence of the firearm that was found in the residence. Likewise, I recommend that the Court decline to exclude any derivative evidence that was obtained.

#### A. *Standing*

The Eighth Circuit Court of Appeals has determined that in a proper case, a defendant can abandon his claim to a dwelling and, thereby, lose standing to pursue a Fourth Amendment challenge to a search of that dwelling. *Camberos-Villapuda*, 832 F.3d at 951-52. In *Camberos-Villapuda*, the Eighth Circuit concluded that the defendant abandoned his property interests in a home when the defendant "told the officers that he was not living at the house, had not been inside, and did not know who lived there." *Id.*

at 952. Such statements, the Eighth Circuit found, amounted to the defendant "'unequivocally disavow[ing]' any relationship with the home," which was sufficient to find that defendant had abandoned the home. *Id.* (quoting *United States v. Monie*, 907 F.2d 793, 794-95 (8th Cir. 1990)).

In the instant case, however, defendant did not unequivocally disavow any relationship with the home. In considering the totality of the circumstances, as I must, I find that the objective facts demonstrate that defendant did have an interest in the residence. *See id.* (holding that whether an abandonment has occurred is considered in light of the totality of the circumstances, "based on the objective facts available to the investigating officers at the time they conducted the challenged search"). Although defendant repeatedly stated that he did not live at the residence and that the home was Ms. LaFrancois', defendant moved through the residence freely, attempted to assert authority over the occupants of the home, and appeared to be in the residence with Ms. LaFrancois' consent. Further defendant's child with Ms. LaFrancois lived in the residence, and defendant helped care for the child while both defendant and the child were in the residence. As such, the objective facts available to the officers would indicate that defendant had at least some interest in the home, and his statements otherwise did not amount to an unequivocal disavowal of any relationship with the residence. I therefore find that defendant does have standing to pursue his Fourth Amendment claims.

### B. *Whether Entry Into the Residence Was Lawful*

I find that the officers' initial entry into the residence was justified based on their community caretaker responsibilities. When Officer Cross arrived at the residence, he had not been previously informed that any children were present in the home and therefore had no reason to believe that children were present. When Officer Cross observed N.R. gesturing Officer Cross toward the house, however, Officer Cross became aware that at least one child was in the residence and that N.R., at the very least, was

trying to capture Officer Cross' attention. Because Officers Cross and Pregler communicated with each other—and there is no contention otherwise—this information was imputer to Officer Pregler. *See Thompson*, 533 F.3d at 969.

When Ms. LaFrancois came out of the residence in response to the officers knocking on the door, Officers Cross and Pregler observed scratches on Ms. LaFrancois' face and neck and noted that Ms. LaFrancois was visibly upset. Ms. LaFrancois stated that defendant was in the residence. Based on the officers' training and experience, a 911 call reporting a domestic dispute, defendant's presence in the residence, the scratches on Ms. LaFrancois' face and neck, and Ms. LaFrancois' demeanor all combined to indicate to the officers that a possible domestic assault was in progress. When Ms. LaFrancois reentered the residence to ask defendant to go outside to speak with the officers, the officers heard crying coming from inside. This crying is also audible on the bodycam footage. The officers did not know, however, who was crying or why. As a result, the officers had reason to believe that defendant, N.R., and at least one additional unaccounted for person—possibly a child or baby—were inside the residence. The officers further concluded that Ms. LaFrancois was upset, someone was crying, and N.R. was emotional, but the officers did not know the reasons for these reactions.

The United States Supreme Court has opined that where officers "have good reason to believe [a threat of domestic violence] exists," officers "undoubted[ly]" have a right to enter the residence in order to protect a victim. *Georgia v. Randolph*, 547 U.S. 103, 118-19 (2006). Based on the officers' belief that a domestic assault was occurring, and based on the volatility of domestic violence situations, the officers could reasonably believe that Ms. LaFrancois, N.R., and/or the presently unidentified crying individual[2] could have been in danger. The officers, therefore, could lawfully enter the residence to

---

[2] The crying individual was ultimately determined to be a one-year old baby. There are no allegations that the baby was harmed.

determine whether the individuals were actually in danger and, if so, to protect the individuals. *Id.*; *Quezada*, 448 F.3d at 1007 (citing *Mincey*, 437 U.S. at 392-93). *See also United States v. Harris*, 747 F.3d 1013, 1017-18 (8th Cir. 2014) ("When police must make a split-second decision in the face of an emergency to either stand idly by, permitting a dangerous situation to continue uninterrupted, or act, addressing the potential danger to protect the public, we have reasoned that officers are expected to act.").

It is of no consequence that defendant and Ms. LaFrancois expressly did not consent to the officers' entry. Even where consent is withheld, if an entry is otherwise justified based on an exception to the warrant requirement, the entry is lawful. *Randolph*, 547 U.S. at 118-19. *See also Patrizio v. Nelson*, No. 14-CV-7497 (JBW) (VMS), 2016 WL 3582047, at *8-9 (E.D.N.Y. June 28, 2016) (citing *Randolph*, 547 U.S. at 118-19, for the proposition that "where there are exigent circumstances present, . . . non-consent does not render warrantless entry unlawful"); *United States v. Lawrence*, 236 F. Supp.2d 953, 959 (D. Neb. 2002) (In a domestic violence situation, the court held that "[e]ven had no consent been given, the officers' entry was justified by exigent circumstances.").

Therefore, I respectfully recommend that the Court find that the initial entry into the residence was justified based on the officers' community caretaking responsibilities.

C.  *Whether the Search for and Seizure of the Firearm Was Lawful*

Once lawfully inside the residence, Officer Cross proceeded upstairs to check on N.R. and to determine whether she was safe and uninjured. Again, I find that Officer Cross could lawfully proceed upstairs. Officer Cross had previously seen N.R. in the upstairs window and therefore believed her to be upstairs. Officer Cross further observed her gesturing toward Officer Cross, but Officer Cross could not definitively say what the gestures meant. Given that N.R. appeared, at the very least, to be attempting to get the attention of law enforcement, I find that Officer Cross had a reasonable belief that N.R. could be in danger and that Officer Cross could, therefore, proceed upstairs to speak with

N.R. Further, once Officer Cross was upstairs, defendant used his body in an attempt to physically block Officer Cross from speaking with either N.R. or the other child who was upstairs. Such an attempt to prevent law enforcement from reaching a potential victim is probative on whether the individual may be in danger. Defendant does not otherwise argue that Officer Cross' questioning of N.R. was illegal, and I find that it was not.

Through speaking with N.R., Officer Cross learned that a gun may have been present in the residence. At that point, the officers had a belief both that a domestic violence situation may have been in progress and that there may have been a firearm in the house, though the officers did not know definitively where the gun was located. The officers therefore had no way of knowing whether the firearm was in a place that would render defendant, or another occupant of the residence, able to use the firearm against the officers.[3] As a result, the officers had an objectively reasonable belief that there was a firearm in the house and that it could be used against the officers if not located and secured. Thus, exigent circumstances existed such that the search for the firearm was lawful. *United States v. Quarterman*, 877 F.3d 794, 797 (8th Cir. 2017) ("Also justifying warrantless entry or search is an objectively reasonable belief of a threat to officer safety."); *United States v. Henderson*, 553 F.3d 1163, 1165 (8th Cir. 2009) ("[B]ecause domestic disturbances are highly volatile and involve large risks and because the police officers had reason to believe that a loaded gun was in the [same room as the defendant], we think it plain that exigent circumstances justified their effort to secure the weapon."). Likewise, the officers could have had a reasonable belief that the presence of the firearm,

---

[3] Indeed, the gun was not located where N.R. believed it would be, but rather in the couch, as Ms. LaFrancois suggested. Defendant happened to have been sitting on the couch, at the officers' direction, within immediate reach of the firearm. Defendant did not, however, give any indication that he knew the firearm was there and did not make any aggressive movements with respect to the firearm.

combined with the domestic disturbance that seemed to be ongoing, could present a danger to Ms. LaFrancois or the children, or even to defendant. *Quarterman*, 877 F.3d at 798 ("[T]his court has consistently found exigent circumstances where officers reasonably believe a gun or an armed individual presents a danger to others or themselves."). *See also United States v. Uscanga-Ramirez*, 475 F.3d 1024, 1026, 1028-29 (8th Cir. 2007) (finding warrantless search for firearm constitutional when officers responded to domestic dispute, even though the female told officers the defendant had a gun but had not threatened anyone with it); *United States v. Antwine*, 873 F.2d 1144, 1147 (8th Cir. 1989) (finding seizure of a firearm constitutional—even after a suspect seen with a firearm was removed from the home—when there were children present).

My finding is consistent with the Eighth Circuit Court of Appeals' holding in *United States v. Quarterman* that a search for a firearm was constitutional where officers "reasonably believed that there was an ongoing dispute between [the defendant] and his live-in girlfriend," and where the defendant carried a gun while forcing his girlfriend to move out and had previously acted with aggression toward the girlfriend's mother. *Quarterman*, 877 F.3d at 799. The situation in the instant case is similar.[4] The officers received information from N.R. that N.R. believed defendant had a gun while arguing

---

[4] Defendant argues that the facts in *Quarterman* are distinguishable from this case (Doc. 7-1, at 5), but defendant's focus is mistakenly placed on what the officers in the instant case knew prior to entry into the house, versus what they learned after entry. I agree with defendant that officers did not have sufficient information to justify entry into the house under the exigent circumstances exception to the warrant requirement. Focusing on the time before entry, defendant is correct that this case is distinguishable from *Quarterman*. But officers did have sufficient information to justify their warrantless entry into the residence under the community caretaker exception. Once inside the house, they learned more information, including defendant's probable use of a firearm during the dispute and the continued existence of the firearm in the house. The proper inquiry with respect to the search for the firearm is to consider the information law enforcement officers had just prior to beginning their search for the firearm, not the information they had prior to entering the residence. When viewing this case under the proper inquiry, this case very closely resembles *Quarterman*.

12

with Ms. LaFrancois. Prior to locating the gun in the couch, Ms. LaFrancois confirmed that she also believed defendant had a gun while the couple was arguing, based on defendant holding his arm behind his body as though he was reaching for a gun that was tucked into his waistband. Based on the facts set forth herein and Eighth Circuit precedent, I find that the search for the gun was necessitated based on exigent circumstances. As such, I see no basis for suppressing any evidence, including derivative evidence. I therefore recommend that the Court **deny** defendant's motion in its entirety.

### IV. CONCLUSION

For the aforementioned reasons, I respectfully recommend that the Court **deny** defendant's Motion to Suppress Evidence. (Doc. 7).

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and FED. R. CRIM. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* FED. R. CRIM. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 9th day of August, 2018.

_____
C.J. Williams
Chief United States Magistrate Judge
Northern District of Iowa