**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 18-CR-1025-LRR |
| vs. | **ORDER** |
| KENNETH LAMONT SANDERS, | |
| Defendant. | |

*TABLE OF CONTENTS*

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *1*

*II. RELEVANT PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . *1*

*III. STANDARD OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*IV. RELEVANT FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . *3*

*V. ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*
    *A.   Entry* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*
    *B.   Search* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*

*VI. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *10*

*I. INTRODUCTION*

The matter before the court is Defendant Kenneth Lamont Sanders's Objections (docket no. 22) to United States Chief Magistrate Judge C.J. Williams's[1] Report and Recommendation (docket no. 16), which recommends that the court deny Defendant's "Motion to Suppress Evidence" ("Motion") (docket no. 7).

*II. RELEVANT PROCEDURAL BACKGROUND*

On June 27, 2018, a grand jury returned an Indictment (docket no. 2) charging

---

[1] On September 11, 2018, Judge Williams became a United States District Court Judge for the Northern District of Iowa.

Defendant with one count of possession of a firearm by a prohibited person in violation of 18 U.S.C. §§ 922(g)(1), 922(g)(9) and 924(a)(2). *See* Indictment at 1-2. On July 18, 2018, Defendant filed the Motion. On July 25, 2018, the government filed a Resistance (docket no. 9). On August 1, 2018, Judge Williams held a hearing on the Motion. *See* August 1, 2018 Minute Entry (docket no. 11). Defendant appeared in court with his attorney, Jill Johnston. Assistant United States Attorney Emily Nydle represented the government. On August 9, 2018, Judge Williams issued the Report and Recommendation, which recommends that the court deny the Motion. On August 22, 2018, Defendant filed the Objections.

On August 13, 2018, Defendant entered a conditional plea of guilty to Count 1 of the Indictment. *See* August 13, 2018 Minute Entry (docket no. 17). On August 14, 2018, Judge Williams issued a Report and Recommendation (docket no. 19), which recommended that the court accept Defendant's plea of guilty. On August 29, 2018, the court accepted the August 14, 2018 Report and Recommendation. *See* Order Accepting Conditional Guilty Plea (docket no. 24). The matter is fully submitted and ready for decision.

### III. STANDARD OF REVIEW

When a party files a timely objection to a magistrate judge's report and recommendation, a "judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation."); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (noting that a district judge must "undertake[] a de novo review of the disputed portions of a magistrate judge's report and recommendations"). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the

magistrate judge." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."). It is reversible error for a district court to fail to engage in a de novo review of a magistrate judge's report when such review is required. *See Lothridge*, 324 F.3d at 600. Accordingly, the court reviews the disputed portions of the Report and Recommendation de novo.

## IV. RELEVANT FACTUAL BACKGROUND[2]

On February 16, 2018, just prior to 10:00 a.m., N.R. contacted her grandmother. N.R. told her grandmother that her mother, Korina LaFrancois, and her mother's boyfriend, Defendant, were "fighting really bad" and that "they need[ed] someone to come." Defense Exhibit A. N.R.'s grandmother contacted the Dubuque Police Department and relayed this information. She stated that she did not know whether any weapons were involved in the altercation and that she did not know whether the fight was verbal or physical. N.R.'s grandmother also informed the 911 operator that there were three minor children present in the residence: N.R., age eleven, and two other children, ages seven and one.

The 911 operator informed Dubuque Police Officers that there was a domestic disturbance and they were dispatched to the residence. Dubuque Police Officer Joel Cross was the first to arrive on the scene and Dubuque Police Officer Tom Pregler arrived shortly thereafter. When Officer Cross arrived at the residence, he observed N.R. gesturing through an upstairs window. Officer Cross made contact with LaFrancois, who came outside to speak with him. LaFrancois was visibly upset, and the officers observed

---

[2] After reviewing the Hearing Transcript (docket no. 20), the court finds that Judge Williams accurately and thoroughly set forth the relevant facts in the Report and Recommendation. *See* Report and Recommendation at 1-4. Therefore, the court shall only briefly summarize the facts here. When relevant, the court relies on and discusses additional facts in conjunction with its legal analysis.

3

red marks on her face and neck. Despite these observations, LaFrancois told the officers that everything was okay. Officer Cross informed LaFrancois that he believed that N.R. had heard a disturbance and had contacted law enforcement. LaFrancois appeared concerned and responded, "Do not tell him that she called you guys." Government Exhibit 1.

Officer Pregler told LaFrancois that they needed to speak with Defendant. LaFrancois explicitly stated that she did not want the officers to enter the residence, but offered to have Defendant speak with the officers outside. The officers assented to LaFrancois going back into the residence to retrieve Defendant. When LaFrancois opened the door to the residence, however, the officers could hear crying coming from within the residence. Upon hearing the crying, the officers determined that they should enter the residence. The officers opened the door and observed Defendant and LaFrancois standing just inside the door and a crying infant located in a nearby playpen.

Shortly after entering the residence, Officer Cross started to go upstairs to check on N.R. Defendant attempted to physically block Officer Cross from communicating with N.R. and N.R.'s seven-year-old brother, who was also upstairs. Eventually, Officer Cross was able to make contact with N.R. and Defendant returned downstairs with Officer Pregler. N.R. was distressed and crying. She told Officer Cross that Defendant "had a gun out," that it "was downstairs" and that she believed it was located in one of the drawers below the "big mirror." Officer Cross went downstairs and looked through the drawers to which N.R. had indicated. He did not locate a firearm. Officer Cross then returned upstairs to speak with N.R. again. N.R. stated that she never saw Defendant in possession of a firearm, but could hear her mother yelling, "Put the gun down! Put the gun down!" N.R. further stated that it sounded like LaFrancois was being choked during the altercation.

Officer Cross then went outside, where LaFrancois was sitting, to ask her where the

firearm was located. LaFrancois said she did not know for sure, but suggested that it could be in the couch. Officer Cross entered the residence, looked in the couch and located the firearm. Officer Cross subsequently questioned LaFrancois regarding the firearm and the circumstances of the fight. Officers ultimately arrested Defendant.

## V. ANALYSIS

Defendant raises two objections to the Report and Recommendation. First, Defendant asserts that Judge Williams "incorrectly found that the warrantless entry into the residence was lawful." Brief in Support of Objections (docket no. 22-1) at 1. Second, Defendant contends that Judge Williams "incorrectly found that the search for the firearm was lawful." *Id*. at 2. The court shall address each objection in turn.

### A. Entry

Defendant objects to Judge Williams's legal conclusion "that the officers' initial entry into [the] residence was justified by the officers' community caretaker responsibilities." *Id*. at 1. Defendant asserts that "[t]here is nothing in the record to indicate that the officers had information that the disturbance was anything more than a verbal argument." *Id*. Defendant emphasizes that "officers let [LaFrancois] re-enter the residence after their initial encounter with her, despite their observations of her physical appearance and emotional state." *Id*. at 2. Defendant asserts that this "undermines a conclusion that the officers were concerned that [she] was or could be subject to domestic violence." *Id*. Defendant contends that "the facts of this case do not support a conclusion that [the officers] had a 'good reason'" to believe that a "'threat of domestic violence' exist[ed]." *Id*. (quoting Report and Recommendation at 9).

"The Fourth Amendment generally prohibits police from entering a residence without a warrant, but there are exceptions to the rule." *United States v. Brandwein*, 796 F.3d 980, 984 (8th Cir. 2015) (citation omitted). "One exception . . . is the authority of police to undertake so-called 'community caretaking functions.'" *Id*. "[T]he 'community

5

caretaking functions' of law enforcement [are] activities that are 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *United States v. Smith*, 820 F.3d 356, 360 (8th Cir. 2016) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). Community caretaking includes activities "which are undertaken to help those in danger and to protect property." *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006); *see also United States v. Uscanga-Ramirez*, 475 F.3d 1024, 1028 (8th Cir. 2007) ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978))). The Eighth Circuit Court of Appeals has "long held the 'view that legitimate concern for the safety of individuals may constitute "exigent circumstances" justifying warrantless entries and searches.'" *United States v. Janis*, 387 F.3d 682, 687 (8th Cir. 2004) (quoting *United States v. Antwine*, 873 F.2d 1144, 1147 (8th Cir. 1989)).

"A police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention." *Quezada*, 448 F.3d at 1007; *see also United States v. Harris*, 747 F.3d 1013, 1017-18 (8th Cir. 2014) ("When police must make a split-second decision in the face of an emergency to either stand idly by, permitting a dangerous situation to continue uninterrupted, or act, addressing the potential danger to protect the public, we have reasoned that officers are expected to act."). "The 'reasonable belief' required under the community caretaker doctrine 'is a less exacting standard than probable cause.'" *Smith*, 820 F.3d at 360 (quoting *Quezada*, 448 F.3d at 1007). The court looks "to the facts known to the officers at the time they made the decision to enter." *Id*. "A search or seizure under the community caretaking function is reasonable if the governmental interest in law enforcement's exercise of that function, based on specific and articulable facts, outweighs the individual's interest in freedom from government intrusion." *Id*.

6

The court finds that the officers had a reasonable belief that an emergency existed within the residence. The officers were informed that there was a domestic disturbance at the time they were dispatched. Although the officers did not know whether the domestic disturbance was physical or verbal prior to their arrival, Officer Cross observed scratches on LaFrancois's face and neck. LaFrancois was visibly upset when speaking with Officer Cross. Thus, officers could reasonably believe that Defendant and LaFrancois had been in a physical altercation. The Eighth Circuit "has recognized that 'domestic disturbances are highly volatile and involve large risks.'" *United States v. Quarterman*, 877 F.3d 794, 798 (8th Cir. 2017) (quoting *United States v. Henderson*, 553 F.3d 1163, 1165 (8th Cir. 2009)); *see also Georgia v. Randolph*, 547 U.S. 103, 118 (2006) (providing that "[n]o question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists").

Further, when speaking with LaFrancois, Officer Cross explained to her that he believed that N.R. had heard the disturbance and contacted law enforcement. LaFrancois's response evidenced concern and fear as she stated, "Do not tell him that she called you guys." Government Exhibit 1. In light of this statement, the officers could reasonably have believed that N.R. may have been at risk. Additionally, as soon as LaFrancois opened the door the officers heard crying coming from within the residence. Although the officers did not know from whom the crying was coming, they could reasonably believe, based on the circumstances, that the crying indicated that someone was in distress. As stated, there were facts upon which the officers could rely in concluding that Defendant may be a threat to either the children present or LaFrancois once she reentered the residence. *See Quarterman*, 877 F.3d at 799 (noting that "officers had an objectively reasonable basis to believe that [the defendant] was armed and a threat to [his girlfriend] or others").

That the officers permitted LaFrancois to re-enter the residence does not compel a contrary conclusion. Upon her reentry, law enforcement heard crying. Although the officers did not know who was crying or why, "officers responding to situations involving possible domestic violence must have sufficient leeway to make snap judgments based on imperfect information." *Maeberry v. City of St. Paul*, No. 09-1216 (JNE/JJG), 2010 WL 2814285, at *4 (D. Minn. July 16, 2010). As previously noted, LaFrancois's statements indicated that one of the children in the home could be at risk. The court finds that the officers' belief that someone inside the residence needed immediate aid was not objectively unreasonable. Therefore, the officers' initial entry into the residence was justified by their community caretaking responsibilities. Accordingly, the court shall overrule this objection.

### *B. Search*

Defendant objects to Judge Williams's finding "that the search for the firearm was lawful." Brief in Support of Objections at 2. First, Defendant asserts that "Officer Cross proceeding upstairs and speaking with N.R." and LaFrancois's statements "about the presence of a firearm and its possible location" are "fruits of the poisonous tree"—namely, the officers' initial entry. *Id*. Defendant argues that, in light of this illegality, the subsequent "search for the firearm should be deemed unlawful." *Id*. at 3. For the reasons previously articulated, the court finds that the officers' initial entry into the residence was valid. Therefore, absent any distinct argument on this point, the court finds that both N.R. and LaFrancois's statements are admissible.

Second, Defendant asserts that "even if the officers' entry and subsequent conversations with N.R. and . . . LaFrancois were lawful, the officers could have, and should have, obtained a search warrant prior to searching the residence for a firearm." *Id*. Defendant contends that "[t]here was no reason that the officers could not have secured the people present in the home . . . and then proceeded to get a warrant." *Id*.

8

Defendant further states that "LaFrancois was present to help ensure her children's safety if the officers had taken the time to apply for a search warrant." *Id*.

The court finds that the officers' search for the firearm was lawful. "[O]fficers who have a legitimate concern for their safety or for the safety of others may search areas that may conceal a threat to them without a warrant." *Henderson*, 553 F.3d at 1165. In the present case, the officers were aware that a domestic disturbance had occurred and reasonably believed that it involved a physical altercation. Further, N.R. stated that, although she had not observed a firearm, she heard her mother yelling, "Put the gun down! Put the gun down!" N.R. told Officer Cross that she believed that the firearm was in a chest of drawers downstairs, in the room where Defendant was currently located. *See id.* (concluding that "because domestic disturbances are highly volatile and involve large risks and because the police officers had reason to believe that a loaded gun was in the bedroom . . . exigent circumstances justified their effort to secure the weapon" even though the defendant "was handcuffed at the time that the search occurred"); *see also Quarterman*, 877 F.3d at 798 (finding that "the officers were objectively reasonable in believing that the gun presented a danger" even though the defendant "had not used, or explicitly threatened to use, the gun"). The officers had reason to believe that LaFrancois had, at the least, been threatened with a firearm and that the firearm was likely located in close proximity to Defendant. Therefore, the court finds that the search for the firearm was lawful.

Further, the scope of the officers' search was strictly limited to the areas where N.R. and LaFrancois indicated the firearm may be located. Based on N.R.'s statements, Officer Cross looked in the chest of drawers in the room just inside the residence. After failing to locate a firearm, Officer Cross spoke with LaFrancois, who indicated that the firearm may have been in the couch. Officer Cross again limited his search to the specific area indicated by LaFrancois and located the firearm in the couch almost immediately. *See Antwine*, 873 F.2d at 1147 (concluding "that the warrantless seizure of the gun was not

9

unreasonable" where the officer "simply located the gun and seized it" and did not attempt to search for any other items). Accordingly, the court shall overrule this objection.

## VI. CONCLUSION

In light of the foregoing, the court **ORDERS**:

(1)  The Objections (docket no. 22) are **OVERRULED**;

(2)  The Report and Recommendation (docket no. 16) is **ADOPTED**; and

(3)  The Motion to Suppress (docket no. 7) is **DENIED**.

**IT IS SO ORDERED.**

**DATED** this 13th day of October, 2018.

*[signature]*
LINDA R. READE, JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA